**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO**

| | | |
|---|---|---|
| **DONALD TAULBEE, et al.** | : | Case No. 1:10-cv-422 |
| | : | |
| **Plaintiffs,** | : | **Weber, District Judge** |
| | : | **Wehrman, Magistrate Judge** |
| vs. | : | |
| | : | |
| **JAMIE CARVER, et al.** | : | |
| | : | |
| | : | |
| **Defendants.** | : | |

**REPORT AND RECOMMENDATION**[1]

Plaintiffs filed this suit on June 26, 2010.  On May 16, 2011, defendants filed a motion for summary judgment based on qualified and statutory immunity.  Doc. 16.  The next day the presiding district judge issued an order appointing me to, among other things, issue a report and recommendation on all dispositive pretrial motions.  Doc. 18.  The motion for summary judgment is now fully briefed.  After considering the record and applicable law, I recommend that summary judgment be granted to defendants.

**I.  Factual and Procedural History**

This sad case involves the fallout from an adoption.  In 2004, plaintiffs Donald and Annette Taulbee became foster parents of a four year old child, L.T., who they adopted some time later.[2]  In February 2009, plaintiffs contacted Scioto County Children

---
[1]Attached hereto is a NOTICE to the parties regarding objections to this Report and Recommendation.
[2]Plaintiffs contend in their response to defendants' motion for summary judgment that defendants failed to provide L.T.'s medical records at the time L.T. was placed in plaintiffs' home.  Even assuming plaintiffs did not receive medical records in a timely manner, any fault in that area would not lie with defendants as L.T. was adopted through Lawrence County Children Services, which is not a party to this action.  *See* Doc. 24-1 (affidavit of Scioto County Records custodian averring that plaintiffs "adopted the child,

Services ("Child Services") and stated that L.T. was "becoming more and more difficult to deal with." Doc. 16-5, p.246. Plaintiffs had five other children in the home and were concerned that L.T. was "acting out on the younger children at home." *Id.* L.T. was eventually diagnosed as being bipolar and suffering from attention deficit hyperactivity disorder. Doc. 21-1, p.361. Thus, plaintiffs wanted to "give" L.T. to Child Services. Doc. 16-5, p.246. Plaintiffs contend they wanted to surrender L.T. to the state because they believed that was the best way for L.T. to get the help she needed.

Child Services attempted to get counseling for the family to attempt to preserve and repair the parent-child relationship, but Donald Taulbee told Child Services that he and his wife were not interested in counseling. Meanwhile, in March 2009, an employee of L.T.'s elementary school called Child Services to lodge concerns about L.T. Among the concerns were L.T.'s persistent sleepiness, which school staff believed may have been caused by being over-medicated, and L.T. having stated that she was not allowed by the Taulbees to eat meals or watch television with the family. Child Services caseworker Jamie Carver, a defendant in this action in both her individual and official capacities, was assigned to investigate this matter.[3]

Carver spoke with the school employee who had reported the concerns about L.T.; the employee expressed gratitude that Carver wanted to meet with L.T. because

---

L.T., through Lawrence County Child Services" so "Lawrence County Child Services would have been responsible for providing any and all medical records or other relevant documents to the Taulbees during the adoption process.").

[3] Plaintiffs denigrate Carver as being inexperienced, but in an affidavit Carver avers that she received a bachelor of arts degree with a major in sociology in 2004 and was hired by Child Services in June 2005. Accordingly, Carver had been a caseworker for over three and one-half years at the time of L.T.'s emergency removal. Doc. 16-1, p. 221. Plaintiffs have not pointed to anything specific which would show that Carver lacked the education or experience to adequately perform her duties.

L.T. had been crying that week, purportedly because Annette had told L.T. that she (Annette) was giving her (L.T.) back. Carver interviewed L.T. at her elementary school, where L.T. stated that her bedroom was in the basement and did not contain toys, a night light, etc. L.T. also stated that Annette was verbally abusive. Carver also interviewed another school employee who was so concerned about L.T. that the employee kept a journal of observations about L.T. Carver obtained the journal, which detailed L.T.'s frequent sleepiness, sloppy appearance and complaints about poor treatment by the Taulbees.

Carver met with another caseworker, Susette Robinette, and they went to the Taulbees' residence. Donald Taulbee took the caseworkers to L.T.'s bedroom, which was located in the basement. The bedroom was sterile, containing only a bed and four concrete walls. Donald told the caseworkers that L.T. was not permitted to watch television with the other children. Donald also told the caseworkers that L.T. was too much to handle and needed care the Taulbees could not provide. Annette Taulbee told the caseworkers that she had stopped combing L.T.'s hair as punishment for L.T. falsely telling school staff that Annette hit her with a hairbrush.[4] Annette also stated that L.T. was not permitted to have toys because she would tear them up and L.T.'s bedroom was downstairs because she had urinated and defecated in her bedroom when it was upstairs.

Plaintiffs contend in their response to defendants' motion for summary judgment that L.T.'s bedroom was in the basement because she had attempted to jump out of a second floor bedroom window. Moreover, Donald avers in an affidavit that "L.T.'s

---

[4]Plaintiffs now contend Annette stopped combing L.T.'s hair so L.T. could learn to comb her own hair.

sister's room was also in the basement." Doc. 21-1, p. 366. Plaintiffs further contend that L.T. was not permitted to watch television because she "obsessed over it and would not budge when it was on" and "also had nightmares about scary television shows whether the show was scary or not." Doc. 21, p. 341. Plaintiffs also complain that Carver's visit to their home was too brief to be adequate.

Shortly thereafter Carver told her supervisor, Dana Lanthorn, that she (Carver) was concerned L.T. was being neglected or emotionally abused and should be removed from the Taulbees' home. At Lanthorn's direction, Carver prepared a removal summary based on emotional maltreatment or neglect and provided it to David Huddleston, a staff attorney for Child Services. Child Services filed a complaint in the Scioto County Court of Common Pleas, juvenile division, seeking an emergency removal of L.T. from the Taulbees' home. The court ordered Child Services to remove L.T. from the home on a temporary, emergency basis. Doc. 16-19. The caseworkers removed L.T. from the Taulbees' home and placed her in foster care.

In addition, Child Services made a determination that the abuse complaint lodged by an employee of L.T.'s school was substantiated and, in accord with state law, provided that determination to the Ohio Department of Job and Family Services ("the Department"). This resulted in suspension of the Taulbees' foster care license, a decision the Taulbees appealed.

At a hearing in the juvenile division of the Scioto County Court of Common Pleas subsequent to L.T.'s emergency removal from the Taulbees' home, Robinette testified that she "did not see what she thought was emotional maltreatment of L.T." Doc. 16-27, p. 301. The magistrate ultimately agreed and ruled that probable cause was lacking to

4

remove L.T. from the Taulbees' home. But the magistrate took pains to note that his decision "should not be construed as a criticism of the investigation . . . ." Doc. 16-27, p. 305. The magistrate also noted that he found Carver to be "forthright and competent" but "a contested exposition of the facts leads this Court to a different view of the salient facts. Simply stated, the Court has a different role than [child services]."[5] *Id.*

Afterwards, the Taulbees declined to be reunited with L.T. And relying on the court's decision in the probable cause hearing, a staff attorney with the Department reversed the substantiated abuse decision in September 2009, which allowed the Taulbees to re-obtain their foster care licenses.

Plaintiffs filed this action in June 2010 against Carver (in her individual capacity and her official capacity as an investigator with Child Services), Lisa Wiltshire (director of Scioto County Child Services Board, in both her individual and official capacities), Scioto County, Ohio d/b/a Scioto County Children Services, and unnamed Jane/John Doe defendants. Doc. 1. After reciting the facts surrounding their adoption of L.T., plaintiffs allege that they asked defendants Child Services for assistance during 2007-2008, but child services "did nothing to assist the plaintiffs despite the fact the child made various allegations against them during that period, each of which was fully investigated by [Child Services] and found to be false . . . ." *Id.* at p. 5-6. Plaintiffs then state that they desired to surrender custody of L.T. to the State of Ohio in February 2009 but defendants were "less than receptive to the surrender . . . ." *Id.* at p. 6. According to plaintiffs,

---

[5]The magistrate also cogently noted the peculiarity that Child Services believed the Taulbees had mistreated L.T. but was opposed to the Taulbees surrendering custody of L.T. to the state. Doc. 16-27, p. 304-05. And the Taulbees did not want to continue to be L.T.'s parents, but appealed the emergency removal of L.T. from their home.

therefore, Carver knew or should have known from the prior unsubstantiated allegations that the March 2009 allegations were false but Carver nonetheless actively pursued the charges "for the sole purpose of having plaintiffs' own children and other foster children removed from their home and/or to punish the Taulbees for seeking permanent surrender of L.T." *Id.* at p. 13-14.  According to plaintiffs:

> the actions taken against them [plaintiffs] by defendants has [sic] been
> based upon the fact that plaintiffs are adoptive, not natural parents of L.T.
> and/or have been in retaliation against the Taulbees to punish them for
> their desire to permanently surrender L.T. and/or dissolve L.T.'s adoption
> and/or to exercise the Taulbees' right to exercise their legal rights and
> have their claims heard in Court.

Doc. 21, p.13.

Plaintiffs further contend their rights to equal protection and due process were violated by defendants, who were acting under color of state law for §1983 purposes. Plaintiffs also raise state law claims, such as malicious prosecution.

On May 16, 2011 defendants Carver, Scioto County and Wiltshire (collectively "defendants") moved for summary judgment based upon qualified and/or statutory immunity.[6]  After considering the parties' briefs and the relevant law, I recommend that defendants' motion for summary judgment be granted.

## II. Analysis

### A. Standard of Review

Summary judgment is proper only if the facts on file with the court demonstrate not only that no genuine issue of material fact remains to be resolved but also that the

---

[6]Plaintiffs have not named with specificity the unknown defendants and it appears as if plaintiffs have taken no significant action to further their claims against the unknown defendants.

moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party may discharge its burden by "pointing out . . . an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). The nonmoving party cannot rest on its pleadings, but must identify specific facts that remain for the finder of fact at trial. *See id.* at 324. Although all inferences are drawn in favor of the nonmoving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986), the nonmoving party must present significant and probative evidence in support of its complaint. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986).

The court's function is not to weigh the evidence and determine the truth of the matters asserted, but to determine whether a genuine issue of material fact remains for a fact finder at trial. *Id.* at 249. The inquiry is whether the evidence presents a "sufficient disagreement to require submission [of the case] to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52. The court reviewing a summary judgment motion need not search the record in an effort to establish the lack of genuinely disputed material facts. *Guarino v. Brookfield Township Trustees*, 980 F.2d 399, 404 (6th Cir. 1992). Rather, the burden is on the nonmoving party to present affirmative evidence to defeat a properly supported motion, *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989), and to designate specific facts that are in dispute. *Anderson*, 477 U.S. at 250; *Guarino*, 980 F.2d at 404-05.

### B. Defendants Are Entitled to Summary Judgment

#### 1. Federal Claims

Defendants assert that they should be granted summary judgment because they are entitled to qualified immunity for claims made against them in their individual capacities. I agree. I also conclude that defendants are entitled to summary judgment on the claims made against them in their official capacities.

**a. Individual Capacity Claims**

Carver and Wiltshire argue that they are entitled to qualified immunity for claims brought against them in their individual capacities. I agree.

"Qualified immunity protects government officials performing discretionary functions from liability for civil damages 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Bartell v. Lohiser*, 215 F.3d 550, 556 (6th Cir. 2000) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). A court utilizes a two-step analysis to determine if a party is entitled to qualified immunity: "first, we determine whether a 'clearly established' constitutional or statutory right has been violated; and second, we ascertain whether the official acted objectively unreasonably in light of the clearly established right." *Bartell*, 215 F.3d at 557. Qualified immunity protects officials from liability only for claims for damages made against the official in his or her individual capacity.[7] *See, e.g., Littlejohn v. Rose*, 768 F.2d 765, 772 (6th Cir. 1985).

"It is clearly established that the Constitution recognizes both a protectible procedural due process interest in parenting a child and a substantive fundamental right

---

[7]Though plaintiffs sued both Carver and Wiltshire in their individual capacities, plaintiffs' allegations primarily involve Carver. Wiltshire is mentioned only as allegedly having failed to properly train Carver and other subordinates or as having ratified Carver's actions.

to raise one's child." *Bartell*, 215 F.3d at 557. So I will assume for the sake of argument that plaintiffs have, or at least had, a constitutionally protected right to raise L.T., their adopted child. But "the State has a concomitant interest in the welfare and health of children in its jurisdiction . . . ." *Id.* at 558. Accordingly, the Court "must assess whether [defendants] were acting to ensure the health and safety of [L.T.] and whether the particular means employed were narrowly tailored to achieve that end." *Id.*

The Court is particularly guided by the Northern District of Ohio's recent decision in the analogous case of *McCabe v. Mahoning County Children Services Bd.*, 2010 WL 3326909, at *6 (N.D. Ohio Aug. 20, 2010). In *McCabe*, x-rays showed fractures of an infant triplet's ribs and skull. A child advocacy doctor concluded the child had been abused. X-rays of the other two triplets showed similar rib and skull fractures. A case worker interviewed the parents, who denied abusing the triplets. Two other doctors told the case worker that the fractures "were consistent with non-accidental trauma." *Id.* at *1. A supervisor at children's services then determined the abuse allegations were substantiated; the parents appealed but a different supervisor affirmed the finding. Thereafter, children services filed a complaint with the juvenile division of the Mahoning County Court of Common Pleas seeking an order awarding custody of the children to the State of Ohio.

After that complaint was filed, two physicians wrote children services to state that the triplets' fractures may have been caused by brittle bone disease, not abuse. A court ultimately dismissed the complaint and determined that the parents had not abused the triplets. The parents then filed suit against Mahoning County, Ohio, Mahoning County Children Services Board, a children services employee, and three children services board

9

members. Those defendants, like the ones in the case at hand, moved for summary judgment, based in part on qualified immunity.

The *McCabe* court held that, even assuming the parents had a due process right to parenting and custody of their children, the issue was whether defendants' actions were "nonetheless excused because a reasonable children services investigator would not have known he was violating clearly established law." *Id.* at *6. Using an "objective legal reasonableness standard[,]" the court held that a court should "analyze whether an investigator in Defendant['s] . . . position objectively would have understood that he was under an affirmative duty to have refrained from such conduct." *Id.* (internal quotation marks omitted).

The *McCabe* court held that defendants' actions were reasonable because a physician had reported that the triplets' fractures stemmed from non-accidental trauma. "Against this backdrop and given his specific responsibility to protect children, [defendant] acted reasonably in alleging child abuse." *Id.* In addition, defendants had no authority to remove the children because "that authority resided exclusively with the Mahoning County Juvenile Court." *Id.* Summary judgment therefore was proper for plaintiffs' individual capacity claims. *Id.*

The result should be the same in the case at hand. Though plaintiffs contend their actions toward L.T. were always taken with L.T.'s best interests in mind, the record reflects that defendants had an objectively reasonable basis for seeking L.T.'s removal from plaintiffs' home. To reiterate, among the facts and allegations contained in the record are: an employee at L.T.'s school was so concerned about L.T.'s welfare that she kept a log indicating L.T.'s often poor affect and condition; a visit to the plaintiffs' home

revealed that L.T. was largely segregated from other members of the family and was not permitted to even have toys; Annette Taulbee ceased grooming or helping L.T. with her appearance, purportedly in retaliation for statements L.T. allegedly made about Annette; and plaintiffs refused to permit professional counseling for L.T.  Indeed, a court removed L.T. from plaintiffs' home on an emergency basis.[8]

Plaintiffs argue that defendants knew, or should have known, that the March 2009 allegations of abuse were unfounded because Child Services found no substantiation when it investigated L.T.'s prior allegations of abuse.  However, the question before the Court is not whether prior investigations proved to be unsubstantiated; the question before the Court is whether defendants violated plaintiffs' clearly established rights by seeking removal of L.T. from plaintiffs' home.  And the fact that no abuse was found in previous investigations does not mean that any new allegations should have been ignored.  As set forth previously, defendants had a reasonable basis to conduct an investigation and that investigation yielded information which gave defendants a reasonable basis to seek L.T.'s removal from plaintiffs' home.

Turning specifically to plaintiffs' due process claims, it is unclear whether plaintiffs raise a substantive due process claim, a procedural due process claim, or both.

---

[8]The fact that a magistrate later found no probable cause for the removal, though significant, does not mean that defendants lacked an objectively reasonable basis for seeking L.T.'s removal.  As defendants note in their reply brief, "a children services department does not become civilly liable simply because of a failure of evidence at a child neglect hearing. If that were the case, children services agencies would become liable every time a parent prevailed at such a hearing."  Doc. 24, p. 2.  And the magistrate expressly noted in his order that his decision should not be construed as a criticism of the investigation of the Taulbees.  Similarly, the fact that Robinette did not believe an emergency removal was necessary does not mean that Carver knowingly violated plaintiffs' clearly established rights by coming to a contrary conclusion.

Plaintiffs clearly have no viable substantive due process claim because any temporary removal of L.T., with its concomitant negative consequences for plaintiffs, was accomplished only through a court order. In other words, defendants did not remove L.T. from plaintiffs' home and, accordingly, did not violate plaintiffs' substantive due process rights. *See Pittman v. Cuyahoga County Dept. Of Children and Family Services*, 640 F.3d at 716, 729 (6th Cir. 2011) ("Hurry cannot be liable for violating Pittman's substantive due process rights because, to the extent that Pittman suffered a deprivation of his fundamental right to family integrity, that deprivation was perpetrated by the juvenile court, not by Hurry. . . . Because the juvenile court has the ultimate decisionmaking power with respect to placement and custody, it alone could deprive Pittman of his fundamental right. Therefore, Hurry's conduct did not violate Pittman's substantive due process rights, and she has qualified immunity against that claim.").

Any procedural due process claim by plaintiffs must also fail. Procedural due process is designed to protect persons from deficient procedures which lead to the deprivation of recognized liberty interests. *Id.* In order to prevail on a procedural due process claim, plaintiffs must show that they were deprived of a protected liberty or property interest and that the deprivation was accomplished without the requisite due process of law. *Id.* When a state seeks to terminate a constitutionally protected interest, it must provide pre-termination notice and opportunity for hearing. *Id.*

Plaintiffs have not demonstrated that they were deprived of either adequate notice or an adequate opportunity to be heard. Indeed, plaintiffs ultimately prevailed in having the emergency removal overturned, as well as having the substantiated abuse

12

determination overturned, and their foster care license was ultimately restored. Plaintiffs accordingly have not shown what additional procedures they were entitled to receive.

Defendants are also entitled to summary judgment on plaintiffs' equal protection claims. Plaintiffs allege "they are treated differently than parents of natural children and are thus denied . . . equal protection of laws." Doc. 21, p. 18. As I construe their allegation, plaintiffs contend defendants initially refused to permit plaintiffs to surrender their parental rights to L.T. because they were the adoptive, not biological, parents of L.T.[9]

"A plaintiff cannot . . . sustain an equal protection claim without showing that a state actor intentionally discriminated against him or her on the basis of membership in a protected class (i.e., race, religion, gender, disability or age)." *Jackim v. City of Brooklyn*, 2007 WL 893868, at *14 (N.D. Ohio March 22, 2007). *Accord Henry v. Metropolitan Sewer Dist.*, 922 F.2d 332, 341 (6th Cir. 1990). Even assuming solely for purposes of argument that adoptive parents are a constitutionally protected class, defendants are entitled to summary judgment.

In an argument related to the magistrate's observation that it seemed odd that Child Services believed the Taulbees had mistreated L.T. but was opposed to the Taulbees surrendering custody of L.T. to the state, plaintiffs argue that "defendants claim they were acting in the best interests of the child by pursuing charges against the Taulbees, yet in direct contravention of this alleged 'best interest' defendants continued to demand that the Taulbees take action to attempt to reconcile with the child . . . before

---

[9]Plaintiffs' request to surrender their parental rights to L.T. was ultimately granted. Donald avers in his affidavit that "L.T. was formally permanently surrendered to defendants on or about August 17, 2009 . . . ." Doc. 21-1, p.368.

surrender would be accepted." Doc. 21, p. 19. Plaintiffs contend this purported bad faith stems from defendants' animus toward adoptive parents. In response, defendants state that they merely wanted to "see if the parent-child relationship was reconcilable before allowing the surrender." Doc. 24, p. 7.

It is unquestioned that parents, including plaintiffs, have the right to surrender parental custody of their children to the state. But the fact that Child Services attempted to dissuade plaintiffs from relinquishing their parental rights toward L.T. does not mean that defendants discriminated against plaintiffs due to plaintiffs' status as adoptive parents. There is nothing in defendants' actions which evidences an obviously intentional intent to discriminate against plaintiffs due to their status as adoptive parents. And plaintiffs have not shown with specificity how defendants' actions or inactions specifically stemmed from plaintiffs' status as adoptive parents. Instead, plaintiffs only generically claim defendants discriminated against them (plaintiffs) because of plaintiffs' status as adoptive parents. Plaintiffs' lack of specificity is fatal to their equal protection claims.

Finally, plaintiffs fleetingly contend defendants violated their (plaintiffs') right to privacy. But plaintiffs do not cite authority for the proposition that Child Services, or employees thereof, violate any parental privacy rights by undertaking an investigation when allegations of child abuse are made. Indeed, plaintiffs' position runs contrary to the holding that "the right of familial privacy does not include a "constitutional right to be free from child abuse allegations.'" *Perry v. Carter*, 1998 WL 1745365, at *3 (E.D.Va. July 27, 1998) (quoting *Hodge v. Jones*, 31 F.3d 157, 164 (4th Cir. 1994)). An investigation into allegations of child abuse must be, by its very nature, intrusive.

Plaintiffs' privacy violation claims are also seemingly at odds with their concomitant claim that Carver failed to spend adequate time at plaintiffs' home and did not conduct a sufficiently thorough investigation.

I conclude, therefore, that defendants did not knowingly violate clearly established law in this case. Perhaps reasonable minds could differ as to whether the facts and circumstances justified L.T.'s removal from plaintiffs' home. But the record does not support a conclusion that defendants' actions or inactions were so egregious as to rise to the level of knowingly violating clearly established law. Wiltshire and Carver are, accordingly, entitled to qualified immunity and, concomitantly, summary judgment for all federal claims against them in their individual capacities.

### b. Official Capacity Claims

Likewise, all defendants are entitled to summary judgment on federal claims brought against them in their official capacities. An act against a government employee in his or her official capacity is really an action against the employee's agency. *McCabe*, 2010 WL 3326909 at *7. Thus, the official capacity claims are actually claims against Scioto County.

Scioto County cannot be held liable under a respondeat superior theory; instead "a plaintiff must demonstrate a direct causal link between the policy or custom of the government and the constitutional deprivation by showing that the alleged injury was caused by the execution of the particular policy or custom." *Id.* To reiterate, the record does not support a conclusion that defendants violated plaintiffs' constitutional rights. In addition, plaintiffs have not shown a policy or custom of Scioto County which permitted plaintiffs' alleged injury to occur. Plaintiffs allege, essentially, that Child Services and,

by extension, Scioto County engaged in a vendetta against them when they (plaintiffs) made known their desire to give up their parental rights to L.T. But plaintiffs "must show specific facts supporting their claim; mere conclusory allegations of policy or custom are insufficient." *Id.* Plaintiffs have not shown which specific policy is purportedly improper or unconstitutional, or how there is a direct causal link between that policy and the purportedly improper acts of defendants. Defendants are entitled to summary judgment on plaintiffs' official capacity claims.

### 2. State Law Claims

In addition to their federal claims, plaintiffs raise numerous state law claims, including claims for invasion of privacy, failure to train, malicious prosecution,[10] intentional interference with contractual relations and defamation. But because defendants should be granted summary judgment on plaintiffs' federal claims, the Court has the discretion to decline to exercise supplemental jurisdiction over plaintiffs' state law claims. *See, e.g., Zimmerman v. Crabtree*, 2010 WL 2572058, at *5 (S.D.Ohio May 27, 2010). Indeed, the Sixth Circuit has stated it generally does not favor a district court retaining jurisdiction over state law claims if federal question claims are resolved before trial. *See, e.g., Gaff v. Federal Deposit Ins. Corp.*, 814 F.2d 311, 319 (6th Cir. 1987) ("It is generally recognized that where, as in this case, federal issues are dismissed before

---

[10]Plaintiffs correctly state in their brief that the Sixth Circuit "has recognized a federal claim for malicious prosecution under the Fourth Amendment." Doc. 21, p.354. *See, e.g., Thacker v. City of Columbus*, 328 F.3d 244, 259 (6th Cir. 2003) ("We agree that we are obliged to . . . recognize a separate constitutionally cognizable claim of malicious prosecution under the Fourth Amendment."). But plaintiffs' malicious prosecution claims should be deemed to be based upon state law as criminal charges were not filed against plaintiffs, nor is the Fourth Amendment relevant to the case at hand.

trial, district courts should decline to exercise pendent jurisdiction over state law claims.").

Defendants contend they should be afforded immunity to plaintiffs' state law claims pursuant to Ohio statutory law. Unsurprisingly, plaintiffs disagree. But if defendants are granted summary judgment on plaintiffs' federal claims, this Court need not resolve this state law dispute. I thus recommend that plaintiffs' state law claims be dismissed without prejudice. *See, e.g., Zimmerman*, 2010 WL 2572058 at *6 ("Accordingly, in light of the recommendation that the Defendants are entitled to summary judgment on Plaintiff's federal claims, it is further recommended that Plaintiff's state law claims should be dismissed without prejudice.").

### III.  Recommendation

For the foregoing reasons, it is **RECOMMENDED**:

Defendants' motion for summary judgment [Doc. 16] should be **granted** as to plaintiff's federal claims and defendant's state claims should be dismissed without prejudice.

Date: September 8, 2011               /s J. Gregory Wehrman
                                      J. Gregory Wehrman
                                      United States Magistrate Judge

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO

| | | |
|---|---|---|
| **DONALD TAULBEE, et al.** | : | **Case No. 1:10-cv-422** |
| | : | |
| **Plaintiffs,** | : | **Weber, District Judge** |
| | : | **Wehrman, Magistrate Judge** |
| vs. | : | |
| | : | |
| **JAMIE CARVER, et al.** | : | |
| | : | |
| | : | |
| **Defendants.** | : | |

## NOTICE

    Attached hereto is the Report and Recommendation of the Honorable J. Gregory Wehrman, United States Magistrate Judge.  Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations **within 14 days** after being served with this Report and Recommendation.  Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections.  A party may respond to another party's objections **within 14 days** after being served with a copy thereof.  Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).